### GUY NEEDHAM V. THE STATE.

No. 6315. Decided June 15, 1921.

Rehearing denied October 19, 1921.

**1.—Robbery—Accomplice—Corroboration—Insufficiency of the Evidence.**

Where, upon trial of robbery the conviction depended upon accomplice testimony, but the evidence was insufficient to corroborate said accomplice testimony, the judgment must be reversed and the cause remanded.

**2.—Same—Immunity—County Attorney—Privileged Communication.**

Where, upon trial of robbery, the accomplice, when testifying for the State, denied that he had any agreement with the county attorney promising immunity against prosecution, and the county attorney ·also denied having such an agreement, but when asked if he had not made such an agreement with the attorneys for said witness, he declined to testify on the ground that such agreement was a privileged matter; Held, that the county attorney should have answered, and this was not a privileged matter.

Appeal. from the District Court of Harrison. Tried below before the Honorable P. O. Beard.

Appeal from a conviction of robbery; penalty, five years imprison· ment in the penitentiary.

The opinion states the case.

*John E. Taylor,* for appellant.—On question of corroboration: Maibaum v. State, 128 S. W. Rep., 378; Jones v. State, 129 id., 1120; Fair v. State, 160 id., 1187.

*R. H. Hamilton,* Assistant Attorney General, and *Scott & Casey,* for the State.—On question of corroboration: McCue v. State, 170 S. W. Rep., 280; Holmes v. State, 157 S. W. Rep., 493.

HAWKINS, Judge.—Appellant was convicted of robbery, and his punishment assessed at five years in the penitentiary.

On the morning of December 27, 1920, about three or four o'clock, a robbery took place over a garage (or, as some described it, over Moore's Transfer Company), where a number of parties were engaged in a poker game. That Russell Jones was the man who held the pistol on the crowd while one of his confederates secured the money from the parties present is a conceded fact.

We are met at the threshold of our investigation with an assignment that the evidence does not meet the requirements of the law in the corroboration of Jones. Without here setting out Jones' testimony, it may be stated that he makes out a case of conspiracy to rob, as to himself, Cornwall, Jackson, Harris and appellant. According to the agreement as detailed by Jones, Cornwall, and Harris were to enter the poker game and guard against any of the other parties present making any resistance, and aid Jones in securing the money from those present. We may say that the evidence indicates that Cornwall and Harris carried out their part. At least they were present, and Harris took the money from the parties, while Jones held the pistol on them; Cornwall in the meantime holding his hands up along with the others. Jackson was to drive the automobile and have it at a convenient and agreed place to facilitate escape from the scene after the robbery was accomplished. Jones was to go up and do the part of actually holding the poker game up, while Needham, appellant, was to remain at the

bottom of the stairway with a pistol to prevent anyone entering or leaving during the robbery. Jones claims that Needham was at the bottom of the stairway to do his part when he, Jones, went up the steps. When Jones entered the door at the top of the steps he met Dick Lancaster coming out. Jones permitted him to pass, expecting, as he says, that Needham would take care of him as he went down. Something in Jones' manner attracted Lancaster's attention, and he lingered long enough on the landing outside the door to hear Jones command to the crowd on the inside to "put your hands up."

From here on we will bear in mind the rule of excluding the testimony of an accomplice from consideration in ascertaining if other evidence tends to connect Needham with the robbery. After hearing Jones tell the crowd inside the room to hold up their hands Lancaster immediately went down the stairway and almost directly across the street to the Marshall cafe. No one accosted him at the bottom of the stairs, and he observed no one there or thereabout; in other words, he never saw Needham, where the latter was supposed to be. He found in the cafe Bechtold, a policeman, and Rogers, a night watchman. He told them at once that the poker game across the street was being held up. The two officers immediately went across the street and up into the room, and Lancaster walked out in front of the cafe. Within thirty seconds or a minute after the officers entered the room Lancaster heard some shots, and Bechtold came running down the stairs, at which time the shooting was still going on upstairs. About the time Bechtold reached the foot of the stairs Lancaster heard a shot which he thought came from the east, on the street, but did not see who fired the shot. The witness Lancaster says that, thinking possibly the shooting was coming out into the street, he stepped back into the doorway that went into the cafe. Bechtold ran into the cafe and directed somebody to telephone for help. The witness Lancaster then saw Rogers come down the stairs, and after him Jones. About the time he saw Jones coming down the steps Lancaster saw some one down at the end of the block; could not describe him, but merely noticed some one as they went around the corner.

Bechtold, one of the officers, never saw anybody when he and Rogers walked across the street and up the stairs after having been told by Lancaster that a robbery was in progress. After they got up the stairs and into the hall where the robbery occurred, Jones and the officers began shooting, and Bechtold was the first one down the steps; about the time he struck the bottom of the stairway coming out of the door, a shot was fired from the east, but he does not claim to know who fired it, and never saw anybody fire the shot; later, a sign hanging over the stairway was examined, and a hole was found in the sign, which was apparently made by a bullet traveling from the east. The testimony of Rogers, the other officer, is to the same effect as Bechtold's, that they saw no one as they went across the street and up the stairway.

About fifteen or twenty minutes after the robbery he saw Needham mingling with the crowd at the Marshall cafe, and making inquiry about the robbery. Rogers was slightly wounded in the shooting in the gambling hall, and when he came down the steps after the shooting he first started east, but noticed nobody at that time near the foot of the stairway. Rausheck, one of the parties who was robbed during the transaction, went down the stairs after the shooting subsided, and a little while after Jones went down, Rausheck claims to have seen a man whom he took to be Needham turning a corner of the block some distance east from the foot of the stairway; thought it was Needham only from his general description and his clothing; (the fact seems to have been established that upon the night in question Needham was wearing a mackinaw coat,) and this witness thought it was he from his general appearance and the character of the coat he was wearing, but was not close enough to him at that time to see the color of the coat. Rausheck went across the street to the cafe, and then up the street west with Bob Alexander, trailing blood which seemed to have been made from the wounds inflicted upon Jones. As they were following the blood trail they met Needham, who was coming towards the cafe, and who said something about blood being all over the sidewalk. Needham at this time was coming from the south, and going towards the Marshall cafe. It was something like twelve minutes from the time of the shooting until they met Needham. Rausheck and Alexander only went a little further and then came back to the Marshall cafe. Needham was there then asking about the holdup, and if anybody was killed, and who shot, and making general inquiries about the robbery. Bob Alexander was present at the time of the robbery, and after it was over and Jones and the officers had gone down the steps Alexander and the other parties came down. When he got down to the foot of the stairs he saw Needham standing either on the sidewalk, or just off the edge of the sidewalk east of Moore's garage, about thirty or forty feet from the stairway. Alexander claims that Rausheck came down ahead of him. Later, this witness, Rausheck, met Needham at Perkins' Brothers corner, about a block and a half from the scene of the robbery. Alexander does not think it was over ten minutes from the time he came downstairs and saw appellant on the sidewalk until he met him the second time on Perkins' Brothers corner. When Alexander came down the steps and saw Needham standing thirty or forty feet from the stairway he did not suspicion that he was implicated in the robbery, and made no report of seeing him there to the officers.

W. M. Drury testified that he was working at Simpson's cafe, and that about the middle of the night Needham was in his place of business and had been there for quite a while; when Cornwall, Jackson, Jones and a man he supposed was Harris came in. The four came in together and that all of them ate supper. This witness says Jackson had a pistol while he was in there, which he, witness, put away for

him for a little while, and afterwards got the pistol and gave it back to Jackson; and that Cornwall, Jackson and Needham went back in the kitchen and were looking at the gun. Pittman, who was one of the parties engaged in the poker game, claims that about ten minutes after the robbery he, witness, was at the Marshall cafe and saw Jackson and Needham ·drive up beside the cafe in a car, and that Cornwall and Harris got in the car, and they all drove away. This same witness claims that fifteen or twenty minutes later, while at the jail, he saw these same parties drive up in a car, and that two boys got out; Carl Craver and Roy Sisk. (This is the only mention of these parties in the record, and there is nothing to show why they got out at the jail, · and there seems to be no connection between them and the other parties to the transaction.)

Does this evidence tend to connect appellant with the robbery? His part in the affair, according to Jones, was to guard the stairway. This he utterly failed to do. As Lancaster came down.and the officers went up none of them saw him, and he in no way attempted to prevent their movements. Nobody knows who fired the shot at Bechtold (if it was fired at him), as he emerged from the place of the robbery. Alexander is the only man who recognized Needham at a point nearer the stairway than the safe, and his actions aroused no suspicion in the witness' mind at the time. This was after the shooting and robbery, when there was considerable excitement and everybody was moving about. The movements, and inquiries of appellant after the robbery, and while he was at the cafe are perfectly consistent with that of a curious bystander. He seems to have been well known in Marshall, and was acquainted with all the parties claimed to have been implicated in the robbery, unless it was Jones, who had only been in the city about two weeks. His association with them as testified to by Drury, before the robbery, may have been entirely innocent; and likewise, the incident related by Pittman of seeing him come up to the cafe in a car with Jackson, and drive away with Jackson, Harris and Cornwall. In truth, the latter is the most suspicious circumstance related against him, and yet, after all, it might be only suspicion, because he may have done all the things any witness outside of Jones says he did do, and yet had no connection with the robbery.

We do not believe the corroboration is sufficient to support the accomplice, and that on this account the judgment must be reversed.

In view of another trial there is one question raised we will discuss. While Jones was testifying he denied having any agreement with the county attorney promising immunity against prosecution. The county attorney also denied having promised Jones immunity, but when asked if he had not made such an agreement with Jones' attorneys, he declined to testify on the ground that such agreement was a privileged matter. The attorney for Jones was then asked about such agreement,

and also claimed it was privileged. The court refused to require them to answer.

The inquiry was for the evident purpose of aiding the jury in determining the interest and bias of Jones, and to enable them to better weigh his testimony. That part of Article 793 (773), C. C. P. applicable here reads: "An attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship." The quotation is an adoption of the common-law rule by our lawmakers with little change. Our courts have been jealous always in protecting communications between a client and his attorney, and properly so. But does this rule extend to embrace a situation like this? Jones was not the county attorney's client. The State of Texas was his client. Jones' attorney was not the county attorney's client. When Jones voluntarily agreed to go upon the witness stand and give evidence for the State, he became the State's witness, but not the State's client, and we see no reason why the county attorney should not have answered whether he had made an agreement with the witness's counsel promising immunity.

Mr. Wharton, Vol. 1, page 1035, Section 498, 10th Edition, says: "When an accomplice turns State's evidence, he cannot claim his privilege, because he must tell all he knows, as this is a condition of his immunity." In Underhill on Criminal Evidence, page 221, Section 176, is the following: "But an accomplice who consents to be a witness for the prosecution cannot claim the privilege for his statements to his attorney. He must, under his arrangement with the State, tell all he knows, and if he knowingly keeps back any relevant fact he loses his right to the immunity promised. And the fact that he may be compelled to state what he divulged to his attorney regarding his guilt may be the only means left to an innocent man accused of crime of meeting the perjury of the real criminal, posing as a penitent accomplice on the witness stand."

Many cases will be found cited in support of the text, but our own Court in Sutton v. State, 16 Texas Crim. App., 490, declines to go as far as the text or authorities cited thereunder would indicate. But that is not the exact question here. Jones was not being asked about any statement made to his attorney. His attorney was not interrogated about any statement made to him by his client. The inquiry was whether he had made a contract with a third party, the representative of the State, and his client's adversary, looking to an armistice and, final peace as between the State and his client if the latter would testify for the State. We do not believe it was privileged. Unless the witness knew about the contract, if one existed, it could, of course, have no influence on his testimony, and would be immaterial. We think the appellant had a right to inquire of witness' attorneys if they had such a

contract with the county attorney, and if so, whether he had communicated it to the witness.

For the errors pointed out, the judgment must be reversed, and the cause remanded.

*Reversed and remanded.*

ON REHEARING.

October 19, 1921.

HAWKINS, JUDGE.—The State, through her representatives, Hons. F. M. Scott, James T. Casey and C. L. Stone, has filed an able motion for rehearing, urging that the court was in error in holding that the testimony of the accomplice witness, Jones, was not sufficiently corroborated. In an equally strong answer the Hon. John E. Taylor, attorney for appellant, contends that the former opinion of the court was correct.

We have read with interest both the motion and the answer, and the arguments in connection with each. A proper consideration of the motion necessarily brings in review the entire evidence in the case, which we have again examined critically. It is a pleasure to review a record where it is apparent, as in this one, that both the State and appellant are represented in such a way that this court may feel assured nothing will be left undone to call its attention to every material fact upon which a proper disposition of the case would depend. We have not been able to bring our minds in accord with the proposition urged by the representatives of the State. We are still of the opinion, after another careful examination of the facts, that proper disposition was made of the case in our former opinion. We will not again review the facts, as this was exhaustively done before.

Therefor, the State's motion for rehearing will be overruled.

*Overruled.*